May it please the Court, I'm Sean Donahue, and I'll be speaking on behalf of petitioners on the Energy Policy and Conservation Act issues, and I'll be dividing my time equally with Ms. Fiering from the California Attorney General's office who will address the NEPA issues. And we'd like to reserve six minutes of time for our rebuttals. In this rulemaking, the Department of Transportation established fuel economy standards for model year 2008 through 2011 light trucks and also reformed its regulatory structure. And in so doing, the agency violated EPCA and acted arbitrarily and capriciously in a number of respects. I want to focus on two of our challenges to the agency's method for setting the reformed fuel economy standards and make a few general comments about our other challenges. EPCA instructs the agency to set fuel economy standards at the maximum feasible level, taking into account four factors, technological feasibility, economic practicability, the effect of other motor vehicle standards of the government, and the need of the United States to conserve energy. In setting these standards, the agency substituted a quite different test. It relied on a cost-benefit analysis attempting to maximize marginal economic benefits, and it avoided the application of technologies where it determined that the cost of a particular technology would exceed its benefits. That is quite a different test than the one established by Congress and set forth in EPCA. The statute requires the agency to maximize not general societal benefits under some open-ended utilitarian calculus, but instead to maximize fuel economy to the extent feasible. And it does have a constraint that the standards must be economically practicable, but the agency here didn't find that the technologies it failed to consider, that its methodology avoided, were economically impracticable, that it would cause substantial hardship for the industry or lead to large losses of jobs or anything of that kind. Instead, the cost-benefit calculation was treated as dispositive, and it removed various technologies from consideration at the threshold. This case is quite like American Textile Manufacturers Institute versus Donovan, in which the Supreme Court, reviewing a case under OSHA, said that a statutory standard turning on feasibility does not, cannot be read to incorporate a cost-benefit analysis, that the term feasible means capable of being done, and we think that feasible still means capable of being done. So I understand your position. Is it that EPCA prohibits the analysis that the agency undertook, or that they simply used a less effective methodology? EPCA doesn't prohibit the agency from conducting a cost-benefit analysis, and indeed Executive Order 12-866 would have required a cost-benefit analysis for a rule with significant impacts like this. What EPCA does require, though, is that the agency maximize fuel economy to the extent that it's not economically impracticable or technologically infeasible, and we think the methodology here didn't apply that statutory standard. And indeed, the gap between what the statute says and the methodology the agency used, I think, becomes evident when one looks on page 41 of Respondent's Brief at the submission that, well, feasible can mean suitable or reasonable. Those are sort of secondary definitions of the term. We think the Supreme Court was right in American Textile that that's not what the plain language of the term means, and that substituting those open-ended terms into EPCA deprives the statute of any meaning. We think the American Textile Court was right to say that it would eviscerate the statute to substitute for a statutory feasibility test an open-ended cost-benefit standard. Furthermore, and compounding the error in terms of the ultimate outcome of establishing fuel economy standards, the agency employed cost-benefit analysis in a manner that was fundamentally flawed. Having chosen to base its choice of standards on this marginal economic benefit standard, the agency proceeded to entirely omit the value of reducing greenhouse gas emissions from its calculus. It assigned a value of zero to greenhouse gas reduction benefits. Five years ago, or more than five years ago, in 2002, the National Academy of Sciences, in a report on the CAFE program that is, in many respects, the basis for this rulemaking, identified reducing greenhouse emissions as the most important reason for regulating in this area, and identified greenhouse emissions as the most important externality caused by burning fuel in automobiles. How should they value the reduction in CO2? Well, there are a number of models. There's a lot of published literature on this. I know that the agency here kind of said, well, the commenters didn't have a unified answer, and it's hard, and there's uncertainty. There is uncertainty. It's difficult, but it's also important. And there's a great deal of literature. I point the court to excerpt of record 1026. Environmental defense pointed to an overview of published peer-reviewed studies on this problem that found that $50 per ton of carbon was the mean in the published studies. That happens to have been the same number that the NAS itself used. Your position is that while there may be some variance in what experts say about monitorizing this, it's not reasonable, and it might well be arbitrary and capricious to set it at zero. We think that the one answer that can't be right is zero, that there would be some discretion in selecting, and there are different methodologies. But as the agency's own peer reviewer, Mr. Wong, commented in page 87 of the excerpts of record, the fact that there's variance among different estimates of the value isn't a reason for completely leaving it out. And there were indeed variance in the values assigned to other externalities, including other environmental externalities that the agency did include. NHTSA suggested that while maybe this unquantified benefit of reducing greenhouse gases, and Ms. Firing will talk more, and I'm sure the Court's aware, this is an extremely important problem. This is not an ancillary quibbling with their cost-benefit analysis. NHTSA suggested, well, maybe the benefits of reducing greenhouse gases would have been offset by another unquantified aspect of this decision, the harms that might occur from down-weighting of vehicles to comply with the new standards. Now, we've, in our brief, challenged the agency's entire treatment of the safety issue, which we think is not consistent with the agency's own study. But for this limited purpose, I point out that it's not enough to say, well, there was something unqualified on the harm side, too, so we're okay leaving out benefits. I note as well that NHTSA itself acknowledged that down-weighting in heavier SUVs actually has safety benefits because of crash incompatibility. That is, heavy trucks, heavy SUVs cause a disproportionate amount of damage when they crash into smaller vehicles, and down-weighting of them actually has a net benefit for society. That wasn't weighed against those alleged safety harms. NHTSA also questioned, well, maybe it wouldn't have made a difference if we had included a value for greenhouse gases because we face a requirement that our standards have to be technologically feasible, and at some point you would have run into feasibility problems. But NHTSA has not claimed that there is no further technology that could have been used. It makes only this general point. And, indeed, the Union of Concerned Scientists calculated that using the $50 a ton of carbon figure would have translated into substantially higher standards of 0.4 to 1.1 miles per gallon. And we're not necessarily arguing that that's the only value, of course. It was for the agency to calculate, but they haven't, in effect, shown that this was a harmless error. This was a substantial sum of money, value of benefits, if you included these. And we think that the agency's cost-benefit analysis reflected the same sort of error that infected its NEPA analysis that Ms. Firing is going to discuss, and namely that is a fundamental failure to address the greenhouse gas global warming problem, a failure to confront that issue in any serious way. I'd like to also just briefly, with the Court's indulgence, enumerate four other issues that we raise under EPCA and then make a general point about the agency's response to those points. First of all, the reformed CAFE standard is a floating standard, so that there's no one number, unlike with prior versions and with the passenger car standard, that companies will have to comply with. Instead, particular manufacturers will have a CAFE obligation that turns entirely on the size or footprint of the vehicles that they choose to use. And many commenters objected that if the past trends toward upsizing of SUVs continue, that this could cause the new regulatory structure actually to cause a deterioration in fuel economy standards, contrary to NHTSA's projection that this will improve fuel economy standards. And these commenters urged that the agency adopt some mechanism to ensure against that deterioration. Indeed, the Union of Concerned Scientists calculated that if you'd had this footprint-based system in place from 2002 onward, overall CAFE obligations would have actually declined over the next two years. We also point out to the court that the transition mechanism that the agency adopted allows manufacturers the choice between the reformed standard and the unreformed standard for each of the first three years. And the manufacturers don't have to make that choice until the end of the model year, so that the projected fuel economy levels listed in the rule, and the agency acknowledges this, will not actual fuel economy will actually be lower than either unreformed or reformed alone, a problem that was characterized in the rulemaking as the worst of both worlds. Are you objecting to any transition period? No, Your Honor. We understand that some transition period and some way to ensure that the new system is, you know, can be complied with, etc., that's reasonable. We were loath to even raise this type of issue, recognizing that courts are concerned about practical problems that agencies face. But we think that the particular way, giving the manufacturers the choice, after the year's over, of course they're going to choose the less exigent one. We think the agency hasn't given, pointed to any practical problems other than the general need for transition, why this sort of cherry picking system needs to be allowed. I also point out on a couple other issues, the failure to, the decision to retain the loophole by which vehicles that are intended and actually used for transportation of passengers continue to be regulated as non-passenger vehicles, and the decision to leave completely unregulated the larger so-called Class 2B trucks, we also believe were unlawful. And on each of these issues, the agency has responded, well, we have broad discretion under the statute, and our choice has to be upheld for that reason. And in our brief, we dispute each of those arguments. We don't think their discretion stretches that far. But their own view of the breadth of their discretion under the statute undermines their argument under NEPA that the statute left them with no room to do more, no room to achieve more conservation, and no need for a fuller NEPA analysis. Thank you. Ms. Farring? Yes, good morning, Your Honors. I'm Susan Farring from the California Attorney General's Office. I'm going to try to reserve five minutes so that Mr. Donahue and I can share some rebuttal time. We note the presence of your boss. Yes. I've noted it, too, Your Honor. I represent the government Petitioners in this matter, but I'll be speaking on behalf of all of the Petitioners addressing the NEPA issue. And unless the Court has questions, I'm not going to address preemption. The agency has essentially conceded that its discussion of preemption in the preamble was not a formal and final agency action. It has no legal effect, it's not challengeable here, and we agree with that. So I'm going to move right into the NEPA argument. We have plenty of arguments, if we could set that aside, right? Yes, yes. NHTSA does two extraordinary things in this rulemaking and in its briefing. First, it dismisses with the most perfunctory wave of its hands the effect of greenhouse from one of the major source of those emissions in this country, light trucks. Second, it tells this Court repeatedly that it has discretion to set the fuel economy level and that the Court must defer to that discretion. And then it tells the Court that it doesn't have to comply with NEPA and it doesn't have to prepare an EIS because it has no discretion. NHTSA's arguments are internally inconsistent, they're factually unsupportable, and they're contrary to NEPA. Now, the NEPA argument is straightforward. When a government agency takes action, it has to be informed of the environmental effects of its action, and it must inform the public as well. Here we have an agency that's setting the fuel economy standard for light trucks, and that will have a direct effect on all of the greenhouse gas emissions from those trucks. And there are several things we know. We know that the U.S. transportation sector is a major source of worldwide emissions. And, in fact, as the Supreme Court recently noted in Massachusetts v. EPA, in a single year, I believe it was 1999, the U.S. transportation sector emitted 1.7 billion metric tons of CO2. The light trucks are between a quarter and a third of those emissions. The emissions from the light trucks have been rising steadily, and they will continue to rise. The emissions from the 2009 trucks will be higher than the 2008 trucks, and so on. And, in fact, these model-year light trucks, 2008 through 2011, will emit cumulatively over their lifetime 2.8 billion metric tons of carbon dioxide. Now, the National Academy of Sciences says, as Mr. Donohue points out, that the single most important reason for setting the fuel economy standard is to control greenhouse gas emissions. And if we can improve fuel economy for passenger cars and light trucks, it will have a nontrivial impact on greenhouse gas emissions. Ignoring all of that, NHTSA deals with greenhouse gas emissions in a single sentence in the environmental assessment. It basically says, yes, these emissions are significant, they're large, but if we compare them to overall emissions, then they're small, and they will not have a significant effect on the environment. That's the full extent of the analysis we get from the agency. Is it your position on behalf of your clients that a full EIS should be done? Yes, Your Honor, yes. Because on the face of the document, based on the facts that I've already enumerated, the total emissions, the importance of the greenhouse gas, the global warming issue, the fact that this is a major source of greenhouse gas emissions, just on the face of the document itself. In fact, while NHTSA tells this Court that it's, I forget how they said it, self-evidently reasonable, that there's no significant impact, it's exactly the opposite. If anything is self-evident here, it's that there is a significant impact in this decision, and if any agency decision will ever require an EIS to deal with global warming, this one requires it. Wouldn't requiring an EIS push these time constraints out significantly? It will, Your Honor. That's why in our relief, the only thing we are asking for is that an EIS be done prior to issuing the new fuel economy for the 2011 model year. And there should be enough time to do that. We're hoping that the Court will act quickly in its decision and that the agency can then very quickly begin the process of doing the EIS, at least for that model year, for 2011. I don't know that it will be possible anymore for 2010. Okay. NHTSA's position, the error in their position is made even more clear by the recent Supreme Court decision in Massachusetts v. EPA, which we brought to this Court's attention. There the Court rejected the argument of the EPA that because greenhouse gas emissions from cars would only resolve or reverse global warming, Massachusetts couldn't demonstrate any harm from the EPA's refusal to regulate the greenhouse gas emissions, and therefore didn't have standing to bring the challenge. The Supreme Court rejected that analysis of the EPA, and it said, first of all, global warming is real. The risks are catastrophic. Even though they are remote, there are catastrophic risks. We're talking about a major source of greenhouse gas emissions, the transportation sector. Reducing those emissions is hardly a tentative step, and a reduction is significant, even if greenhouse gases increase on a worldwide basis. And that exact same, that was a standing argument, but the same analysis applies here. If the Supreme Court has recognized that it harms a petitioner from the agency's refusal to regulate greenhouse gases, then an agency's action that will regulate those gases can no longer be dismissed as insignificant in the context of global warming. The second part of the agency's argument that I want to address is their argument that even if these emissions are The agency says they don't have to comply with NEPA because they have no discretion to consider the environment, and they can't do anything different. Did they make the same argument in Massachusetts? Well, in Massachusetts it was a different situation because the agency there said they didn't have the authority to regulate. Here the agency is conceding that they certainly are regulating greenhouse gases, but they're saying we have come up with the exact fuel economy number that is consistent with the statute. There's no other possibility, and this is the single right answer, so we don't have to prepare an EIS. Now, first of all, that argument is legally wrong because under NEPA, if an agency has discretion to act, it must comply with NEPA. And this agency has already conceded it has discretion to act. This is not a ministerial act. It is said we must comply with NEPA. It's recognized that. Once NEPA applies, if the effects are significant, then the agency has to prepare the EIS. That's the end of the analysis, essentially. But furthermore, their position is factually wrong. This is an agency that has a lot of discretion and keeps telling the court that, and telling the court that it should defer to the agency's discretion. It talks in its brief about the statute's grant of discretion, the need for the agency to exercise its discretion, and it claims it has discretion to, for example, change the entire structure of how fuel economy is set, go from a corporate average to a footprint average. It has the court and tells us it has the discretion to peg its analysis to the least capable manufacturer. It can exclude heavy trucks. It can provide for a transition period. It doesn't have to consider weight. It doesn't have to do a backstop. It doesn't have to monetize the benefits of CO2. It claims that it is exercising its discretion at each and every step, and it can't now tell the court that it has no discretion to exercise. Furthermore, this agency has always recognized that it can consider the environment. In 1977, in one of its earlier rulemakings, it explained to the public what goes into determining the need of the nation to conserve energy, and it said it requires a consideration of the environmental implications of our need for large quantities of petroleum. And, in fact, in its analysis in setting the fuel economy, the agency did take into account environmental factors. It took into account the emission of criteria pollutants, carbon monoxide, nitrogen dioxide, particulate matter, et cetera. Ironically, the single environmental factor it refused to consider, greenhouse gas emissions, is the one factor that the National Academy of Sciences has said is the single most important reason for setting this rule. Now, counsel, what kind of alternatives should they be considering? There are two answers to that, Your Honor. They should be considering the alternative of, for example, some of the things that Mr. Donahue pointed out in his analysis, including the heavier trucks, having a different transition period, considering weight as a mechanism for a fuel economy measure, imposing a backstop. And, in addition, they should essentially do what the National Academy of Sciences did, which was to look at the full range of technologies that are available. And this is set out in that NAS document. You look at the full range of technologies that are available, that are feasible. You figure out what the fuel economy would be and the greenhouse gas savings would be from all of those technologies. And then you do the weighing against the other considerations. So it's our position they should have looked at that full range of technologies that's set out in the NAS document. Did you, your side, want to say a little time for a rebuttal? I do. I do, Your Honor. And I'll ‑‑ You have about four minutes left. Four and a half minutes. Thank you. Thank you very much. We'll hear from the agency at this time. Mr. Byron. May it please the Court, I'm Thomas Byron from the Civil Division of the Department of Justice. With my colleague, Mr. Ronald Spritzer, from the Environment and Natural Resources Division of the Department, we represent the respondents in this case. I will address the issues arising under EPCA and the Administrative Procedure Act and any other questions other than those under NEPA, the environmental issues, which Mr. Spritzer will separately address in a moment. Equally divide the time? More or less, Your Honor, subject to the Court's questions, of course. Sure. The agency in this case did precisely what the D.C. Circuit, in the prior cases arising under EPCA and the CAFE regulations, directed it to do. It balanced the competing statutory factors set forth in EPCA to determine the maximum feasible fuel economy level that the agency determined manufacturers could achieve. Notably, in Petitioner's arguments and in their briefs, they omit an important part of the statutory language, and we've emphasized that in our brief. In doing so, the agency took two important steps. First, under what we call unreformed CAFE, the scheme that has been in place for about three decades now, the agency set forth steadily increasing light truck CAFE standards. Those are not challenged here today, nor is the methodology of establishing unreformed CAFE standards at issue. The petitioners concede that those are appropriate under the statute. The second thing that the agency did in light of the 2002 National Academy of Sciences or NAS report was to consider a reformed mechanism, a mechanism for changing the way the agency implements its statutory authority to determine light truck CAFE standards, and addressing some of the problems that the NAS report and others had identified with unreformed CAFE. Those problems included some perverse incentives that adversely affected safety, and that meant that only one or two full-line manufacturers actually had to make any improvements to the fuel economy of their vehicles under the old system of unreformed CAFE. In adopting a reformed CAFE system, NHTSA improved the fuel economy of light trucks beyond what's possible under the unreformed system, and it does so in a way that is both more equitable and more efficient. It requires not just those one or two full-line manufacturers, what used to be called the least capable manufacturers, to improve their fuel economy, but all light truck manufacturers by focusing on what the agency defined as a footprint, that's roughly the size of a vehicle, and recognizing, as the NAS report did, that size is directly related to fuel usage. Now, the NAS and NHTSA also recognize that size is inversely related to safety as well, or directly related, I should say, to safety as well as to fuel usage. The relationship there... Your argument on safety, opposing counsel says that if you were to downsize the biggest vehicles, that that would have a positive effect on safety, and you really haven't addressed that in your papers, it seemed to me. Yes, Your Honor, that point is correct, and let me explain for a moment why it doesn't affect the end result, because the Kahane study performed in 2003, Dr. Kahane has performed a number of studies concerning size and safety of motor vehicles. The 2003 study is the most recent, and he explained that, yes, the largest vehicles, because of that problem of crash incompatibility, do cause greater harm to the vehicles that they strike in two-vehicle crashes, and that, therefore, reducing the weight of the largest vehicles can have a positive net effect, even though reducing the weight of those largest vehicles has a negative effect on the safety of the occupants of those vehicles, that, as a net matter, it's overcome by the incompatibility effect. Those huge vehicles don't need protection. It's the little guy that needs the protection. Your Honor, it's the position of NHTSA, which is responsible for regulating the safety of motor vehicles, of all light vehicles, that all occupants of the vehicles on our nation's roads deserve the protection afforded by the nation's safety system. Now, what NHTSA did, and what the Kahane study explained, is that there's a crossover weight, a weight at which the net benefit of crashing compatibility concerns on the one hand, in other words, the effect on those smaller vehicles, and the effect on occupants, on the other hand, balances out. The only question that the Petitioners challenge is where that crossover weight lies. They say it lies at 3,900 pounds. Dr. Kahane said that's the point estimate. In other words, the point estimate is where we think if you go right there at 3,900 pounds and you increase the weight of everything larger than that, there's a 50 percent chance that you are going to have a net increase of safety overall. Remember, both sets of concerns. There's a 50 percent chance, though, that you'll have a net decrease. That's the point estimate. Now, NHTSA is not just the fuel economy agency in the government. It's also the safety agency. And for that reason, the Secretary of Transportation directed, in light of the persistent concerns since even before the statute was enacted about the effect of safety on increasing fuel economy, the Secretary has directed that NHTSA is the agency to address those fuel economy concerns in light of its safety expertise. Now, NHTSA concluded that a 50 percent chance of making safety worse is inconsistent with the nation's goals overall of a safer highway system. In light of that, NHTSA used what's called confidence bounding. It's a statistical mechanism for determining how confident you are about the outcome and determined that the confidence bound of an additional 1,000 pounds, roughly, taking it to about 5,000 pounds instead of 3,900, would ensure that there was a 95 percent chance that you would not harm the safety of occupants overall in the vehicles that crash. That was a reasonable judgment. It's adequately explained in Dr. Kahane's study and in the final regulatory impact analysis, as we've cited in our brief. And so, Judge Fletcher, I think that the agency did explain in the papers precisely why the one concern of crashing compatibility must be taken into account overall with all of safety concerns and reasonably articulated why it's settled on 5,000 pounds. Petitioners don't dispute that there are some hazards to safety if you down weight, if you reduce the weight of some vehicles. The only question is where that crossover weight comes. Reformed CAFE addresses some of those perverse incentives of the old system and ensures by focusing on footprint or size that down weighting will not adversely affect safety. It also addresses one of the concerns that petitioners pointed out, among others, that there may be an incentive arising from the CAFE structure as a whole of changing the design characteristics of vehicles, including their weight, in order to gain the CAFE system. Under Reformed CAFE, manufacturers can't do that because the CAFE targets for smaller footprint light trucks are approximately the same as those for passenger cars. So Reformed CAFE addresses some of these persistent policy concerns that have been raised. And in adopting Reformed CAFE, the agency took a broad look at a number of ways of implementing the statute's concerns, what the D.C. Circuit has called the competing factors or conflicting policies, quoting Chevron. And the agency's Chevron analysis was the best way to start fresh and fix this problem and improve fuel economy beyond what we otherwise could have done under Unreformed CAFE, is to use these sophisticated computer models that we've developed with the assistance of the Transportation Department's Volpe Center, apply technology to actual vehicle product models as planned by the manufacturers in ways that reflect technical and engineering expertise that NHTSA has acquired over the decades, and determine how to adopt the most fuel-efficient technologies in new models over the next coming four model years in a way that benefits the entire country the most. Now, that judgment was entirely reasonable, and it was explained carefully in over 100 pages, I'll say, in the agency's preamble to the final rule. It certainly satisfies the APA's requirement of reasoned analysis. It also satisfies the Chevron Step 2 requirement that the agency look at a reasonable interpretation of ambiguous statutory terms. Are you going to talk about CO2 or is your co-counsel? I will, Your Honor, yes. Let's cut to the chase. What's the justification for assigning zero value to CO2 reduction? Judge Hawkins, the agency did not assign a zero value. It concluded there was no way to assign any monetary value. The agency did contemplate and take account of the benefit of reduced CO2 emissions as a consequence of improving fuel economy. And it recognized that that benefit weighs in the balance. Now, it couldn't weigh that benefit in a mathematical balance because the range of values was too imprecise and uncertain to assign any particular monetary value. Did the range start at zero? It started at $3 per ton of carbon, very close to zero, Judge Hawkins. You said it, your client said it at zero.  Your client said it at zero, didn't he? Only as a matter, I think it's not fair, Judge Hawkins, to say that the agency chose zero as the value. That's not what the agency said in the final rule. To be sure, the agency didn't assign any value. And the reason for that. Just like saying yes, we have no bananas? Your Honor, as a mathematical matter, you're right. Assigning no value is mathematically the same. But remember, mathematical analysis isn't the only analysis the agency undertook here. As NHTSA explained in. It's cost-benefit, they assigned mathematical values, did they not? For that portion of the Volpe model's analysis, yes, Judge Fletcher. And that aspect of it is governed by those mathematical calculations. But then the agency explained that the cost-benefit analysis of the Volpe model was not the sole basis. For its determinations of economic practicability and technological feasibility. It's hard for me to understand you telling me that it did take gas, greenhouse gases into account. And yet it really, where does that show up? It shows up as we cited in our brief at the portion of the discussion where the agency said there are some unquantifiable costs. They include the value of reducing CO2 emissions. They also include the risks of down-weighting, which the agency said we can't be sure how much the car manufacturers are going to change the weights of their vehicles and the effect that will have on safety. Because NHTSA doesn't dictate which technologies to apply or which vehicles to change the weight of. That's up to the vehicle manufacturers. NHTSA just does a study that says this is one way that we've shown that it's technologically feasible and economically practicable to achieve these particular targets. So the agency wasn't sure how much effect on safety there might be. If the agency had to choose a value for the benefit of reducing CO2 emissions, it likewise would have to choose a value for that unquantifiable effect on safety. That's why the agency said that taken together, all of the unquantifiable costs and benefits likely would not have changed the outcome here. There's another reason as well that it likely would not have changed the outcome elsewhere. NHTSA explained that you would run out of technologies to apply if you used a different measure of costs and benefits, total costs and total benefits, which one commenter suggested. Now, adding a value for the benefit of reducing CO2 emissions would be a relatively small value. One of the estimates the petitioners have advanced is $50 per ton or approximately 12 cents per gallon of gasoline consumed. That is approximately 5 percent of the total value of benefits, $2 per gallon, reducing the fuel consumption. That 5 percent change is very small in the calculus. And the reason that matters is that the way the Volpe model works is it adds the most efficient, the least costly and most beneficial technologies first. At the time that you're looking at the additional changes that could be gained from adding 12 cents to your $2 per gallon of benefits, you are only looking at whether you're going to add the most expensive technologies, those that are least cost effective as well. And at that point, the 5 percent change is not likely to make much difference, as the agency also explained. I would like to ensure that Mr. Spritzer has adequate time to address the NEPA arguments, but before I close, I want to emphasize that the discretion NHTSA has in implementing APCA, its Chevron and APA requirements bound the exercise of that discretion. The agency has to undertake a reasoned analysis. It has to comport with the statutory requirements. And in doing so, it has a good deal of discretion up front in choosing the implementation model that it did here for Reformed Cafe. It doesn't have the kind of discretion that the petitioners would prefer, which is to pick a higher number, because picking a higher number without a reasoned explanation of the implementation does not comport with the APA or with Chevron. And in this case, NHTSA did comply with its obligations as explained by the D.C. Circuit in the case law arising in the 1980s and 90s. I would like you to address why the footprint method is superior to the prior method, because to the uninitiated, it looks like any manufacturer can choose to manufacture whatever it wants, and you only look at the fuel economy that can be achieved in that size vehicle. Now, am I right? You're partially right, Judge Fletcher, and let me explain why it's better. And the reason has to do with some of the flaws and the unusual incentives in the Unreformed Cafe system. Under Unreformed Cafe, NHTSA looked at full line manufacturers, those that produce both smaller light trucks and very large light trucks. And those manufacturers were the ones that had the most trouble achieving the cafe standards historically. They were what's called the least capable manufacturers. NHTSA imposed the burden on those manufacturers alone. And in fact, NHTSA found and the NAS found that the other manufacturers, such as the Japanese manufacturers, the smaller car companies that produce mostly smaller light trucks, basically had to make no improvements to the fuel economy of their vehicles. And the benefits to the nation as a whole of conserving energy were being lost as to those manufacturers. What Footprint does, what Reformed Cafe does by looking at Footprint, is it ensures that even the smallest light trucks must improve their fuel economy. All manufacturers then become subject to the requirements of Reformed Cafe. And that is a major benefit. The burdens and the benefits of improving fuel economy are shared more widely. And the adoption of fuel improvement, fuel economy technologies is more widespread. If there were a combination of the Footprint and an overall corporate limit would seem to be the most cost effective and the most efficient. Was that considered? It was considered and it was rejected, Judge Fletcher, because the agency concluded that it would perpetuate some of the worst incentives of Unreformed Cafe, principally the adverse effect on safety of down weighting or changing the size of vehicles in order to bring a fleet into conformity with a single hard number applied nationwide. The problem with down weighting is that it doesn't respect that crossover weight that we talked about earlier. And if you have a single number that every manufacturer must achieve, irrespective of fleet mix, the full line manufacturers have a major incentive to down weight, not just their largest vehicles, after all, but their smallest as well, with an adverse safety effect net. And that's what the agency said was a problem with Unreformed Cafe that we were trying to fix in Reformed. And by using what the Petitioners call a backstop, we would be perpetuating that problem. If the Court has no further questions, I defer to Mr. Spritzer for the NEPA issues. Thank you. Mr. Spritzer. May it please the Court. I'm Ron Spritzer and I will address the NEPA issues on behalf of the government. Let me begin what I think is clear from this rule, and that is the undisputed fact that this rule will decrease CO2 emissions from light duty trucks relative to the existing regulatory program. The agency did a detailed analysis. There are detailed charts and numbers in the EA. It was certainly not limited to just a one-sentence discussion of CO2 emissions. The agency concluded that there would be approximately a .2 percent decrease in CO2 emissions as a result of the regulations that were adopted. The agency also did, in fact, do a detailed consideration of alternative regulatory approaches that were suggested by commenters. I respectfully refer the Court to, among other things, excerpts of record at pages 1398 through 1400. Counsel suggested, for example, we didn't look at a backstop alternative. We did. It's on page 1399 through 1400. Counsel suggested we didn't consider National Academy of Sciences technologies that they thought were feasible. We did. That is the basis of the technologies that were used in the modeling to determine what was and was not feasible. The agency, as I've indicated, quantified the decrease in CO2 emissions and reasonably concluded that a .2 percent decrease in emissions is environmentally beneficial and should not require the exercise of preparing an environmental impact statement. Well, if there were evidence that you could, say, decrease 5 percent, are you saying that you wouldn't have to do an EIS? No, that's not our position, Your Honor. That's the issue I was coming to next, and I think that's the heart of the controversy between the government and the Petitioners regarding an EIS. Was there statutory authority, based upon the terms of the statute and the evidence in the record of this case, that the agency could, in fact, have done more? Now, let me point out what the Petitioners are alleging here. In the City of Los Angeles case, which both sides have discussed extensively in the briefs, there was a claim that the agency could have set a standard approximately one mile per gallon higher, 27 point, based on a specific provision in the statute that applies to passenger vehicles, not to light-duty trucks, essentially a default provision. The agency had set the standard at 26.5, which was slightly below, that one MPG below the statutory standard. That's not what we have here. There is no benchmark that the Petitioners have provided to the Court to say this is what they could have done differently. What they are asserting is, I submit, a sweeping assertion of statutory authority on this, on the part of this agency to prohibit all emissions or at least all increases in emissions of light-duty trucks, even if they result from factors that are not within the control of the government, such as the fact that individuals may choose to buy more light-duty trucks. Obviously, people don't have to come to the government to purchase a light-duty  truck. They don't have to get the government's permission to decide how many miles to drive those trucks. The Supreme Court's decision in the public citizen case clearly requires a demonstration of proximate cause in order to say that the environmental effect can be attributed to the agency. I did not hear counsel discuss proximate cause, although I suppose it's implicit. Ginsburg. But in that case, that was a case where the President had the power under the statute to admit the trucks to the country. So there was nothing that the agency could do to prevent that. Well, there were things the agency could have done. Not to counterman the President's directive, of course. No. But they do discuss, the Supreme Court does discuss in the opinion that the agency, for example, could have increased the regulatory safety requirements for the trucks, could have conducted more frequent safety inspections. But the Court went on to say there's no evidence that the agency could have gone, or at least it wasn't clear, it was dubious that the agency could have gone beyond those requirements. And it was unclear what, if any, additional reduction in emissions there would be. Essentially, the argument that's being presented here to show our alleged authority to go beyond the terms, beyond the regulations that were promulgated is what's in our brief, namely the position that we have discretion under the statute. I think Mr. Byron has largely answered that. Yes, we have discretion up to a point. We have constrained discretion under the statute. I think to illustrate what I mean by this, a quote from the D.C. Circuit's Center of Auto Safety versus NHTSA case, 793F2nd at page 1340. A fuel economy standard, quote, with harsh economic consequences for the auto industry would represent an unreasonable balancing of EPCA's policies. Our position is we don't have the discretion to engage in such unreasonable balancing. The statute here sets meaningful constraints. Just like in public citizen, there is statutory language in 49 U.S.C. 32902 subsection F. The agency shall consider specific factors. Mr. Donahue has pointed out what those factors are, economic practicability, the technology available in the industry. The agency's reasoned conclusion after considering many alternatives submitted by commenters was that it did not have the authority based upon the current state of technology in the industry, based upon considerations of economic practicability, and based upon the requirements of the statute to go beyond the standards that were set here. We submit that is at least a reasonable interpretation of the statute under Chevron that is entitled to deference. I would note also in the Supreme Court decision in public citizen, the Court did not say that there is an absolute categorical bar on the agency. It said the agency had, I believe the word is eminently reasonably interpreted the statute, that it could not, that it had to license a truck coming in from Mexico if the necessary information were presented. It didn't say the agency had no discretion whatsoever. I submit there are very few instances in which Congress is so specific that it designates every last thing an agency must do. They are trying to limit public citizen very narrowly, and I don't think that's a fair construction of the Supreme Court's opinion. It requires a demonstration of proximate cause in every case, regardless of whether the agency has no authority over admissions or, as in this case where the agency has authority, but tightly, but constrained authority, constrained by the factors Congress has set forth in the statute. So that is, I think, the fundamental issue here. What is the extent of the agency's authority? But I'd ask the Court to keep in mind, it's not just, they're not just asserting in support of their claim for an EIS that we could go a little higher up to some specific point. I read the briefs, I can't find any such claim anywhere. It is a sweeping claim that all light-duty truck admissions in the United States are the responsibility of NHTSA. I submit that argument cannot be sustained under any reasonable construction of the statute. It cannot be sustained under any reasonable interpretation of the Supreme Court's concept of proximate cause. Furthermore, they go beyond just that claim. They even assert that the NHTSA should be deemed responsible for and should conduct an EIS concerning the impact, cumulative impacts of past regulations, which, again, they assert are all admissions that occur above the restraints that NHTSA imposed in those regulations. I don't see how this Court can make that determination. It would have to decide not only that there were additional alternatives, more stringent alternatives available in this rulemaking, but that there were more stringent alternatives available to the agency that it did not pursue in prior rulemakings, of which, of course, this Court has no record before it, for which the statute of limitations for judicial review has long since expired. So I don't, we submit upon this record that the demand for an EIS cannot be supported. Let me address one other aspect of Petitioner's response, which is essentially to say, well, if you did an EIS, you might come up with sufficient information to support some greater degree of authority. I think that puts the cart before the horse, or perhaps more accurately, gets the analysis backwards. The Supreme Court requires a demonstration of proximate cause before we can be required to perform an EIS. They are saying you should do an EIS essentially to determine whether proximate cause is present, that is, to do an EIS, to come up with additional information that they think might expand the type of alternatives that we could require. Now, let me go to the, at least briefly addressed in what little time remains, the question of whether the EA was sufficient. There really are two issues presented here. One is their demand for an EIS. The other is the claim that the EA and the finding of no significant impact was arbitrary and capricious. I would submit, by the way, the issue of alternatives is an EA issue. In other words, if we didn't consider some alternative in the EA that we should have considered, that might be a reason to remand back to the agency to do a more complete EA. It doesn't show that the impact of the regulation is significant, just to say we omitted some alternative. The agency did, in fact, do a detailed analysis of the incremental impact of this rule. As I've indicated, there is quantitative data in the environmental assessment, both on the impact of the prior rule. The agency spent a great deal of time and effort to try and quantify these impacts in a reasonable manner. We do have a standard for assessing. They say that we have essentially made a finding that the impact is not significant without coming up with any standard. We do have a standard. The standard is essentially zero. If we are below zero, if we are only having a moderate, if we are having a moderate positive environmentally beneficial impact, environmental impact statement is not necessary. And that is, I would also add, consistent with what the D.C. Circuit did in the city of Los Angeles case, where it held that even a 1 percent increase, that it was reasonable for the agency to decide that a 1 percent increase, even that was not so significant as to require an environmental impact statement. Here we have a .2 percent decrease. They emphasize Judge Wald's dissent in that case. I submit if the facts in that case had been that the agency was decreasing CO2 emissions, Judge Wald would have no problem whatsoever with the agency making a finding of no significant impact. Finally, let me just note on that issue that I submit it would be an unfortunate precedent for this Court to hold that a regulation which reduces CO2 emissions requires environmental impact statements. Agencies, this agency and other agencies ought to be, ought not to be restrained by requirements, particularly when it's here. They would not be able to increase the standards in any event. My time has essentially expired. I don't know if the Court has any further questions about the EPCA issues. Mr. Byron is still available, but otherwise I think I'm pretty much done. Roberts. I don't see any. Thank you both for your arguments. We have about four and a half minutes for rebuttal. Counsel. Thank you, Your Honor. I'll try to be quick because I think I stole some of Ms. Feiering's time the first  A few points. The D.C. Circuit hasn't approved anything that's before the Court today. The D.C. Circuit has said in Center for Auto Safety and the Public Citizen case that the agency can, in considering economic practicability, can consider whether because of shifts in demand or other factors a fuel economy standard is having harsh economic consequences for industry. No finding like that underlay the procedure by which these standards were set. This was an open-ended cost-benefit analysis. There was no finding that going to the next technology for a particular manufacturer would have these, or at least it's not discernible in the record. And that's part of APA review is the agency showing the path of its reasoning. And when it gets to how did you set the standards for a particular manufacturer, it's very difficult because the product plans on which the standards are based are proprietary, and it's very hard as petitioners to follow how the agency sets standards. But we know the legal test they used, and we know that it was discordant with the statute in much the way that was discussed in American Textile. This is a maximum feasible standard with an economic practicability constraint. It's not an open-ended cost-benefit standard. On safety, I would just refer the court to the Kahane study, which is in the supplemental excerpts. The Kahane study identified 3,900 pounds as the point of zero net impact and itself included an uncertainty analysis, and we think it's inconsistent with the results the agency reached here, in particular given that there are safety hazards or there are safety benefits from down-weighting of heavier vehicles. On CO2, the agency itself used the term zero value. Excerpts of record 1445, column 1, and the suggestion that including carbon dioxide reductions and assigning it a value would not have made any difference because the agency would have run out of technologies. There's no support in the record for that. That's the black box that we know how this works. It's not discernible to you on the outside, but believe us. The running out of technologies comment in the preamble was about a different point. Some commenters urged that they should set standards at the level where overall benefits equaled overall costs, which would have been a significantly more exigent standard, and in response to that suggestion, the agency said we'd run out of technologies. But it doesn't say that adding a monetized benefit for CO2 would not have had any impact on the outcome, unless there are other questions on EPCA. I don't see any. Thank you. Thank you for your argument. Thank both sides for their arguments. Very interesting. Did you have more? I had just briefly, Your Honor. I have a minute and 15 seconds, and I'm going to use them if I may. Three points I want to make, and I don't want to mince words about this first point. In the EA, in the briefing, and in the argument, the government keeps making the same misleading and deceptive statement that this is a decrease in greenhouse gas emissions. It is not a decrease. The emissions are going to be more in 2008 than they were in 2007. They're going up. The decrease is that they have slowed the rate of growth. They're not growing as much as they would otherwise. So I want to be very clear about that with the Court. Secondly, even if we accept the government's argument on face value that there's this change, they call it a decrease, whatever, of 4% cumulatively, .2% looking at U.S. emissions overall, that doesn't mean anything to us unless there's an EIS. We have to know we can no longer dismiss even a small change as insignificant in the context of global warming. We need an analysis to know what that means. Is that business as usual and we're going over the precipice, or is it enough of a change that it will slow the rate of global warming and we'll have a chance to adapt? That's the critical question. Cumulative impacts, the Mexican truck case basically says there has to be a connection between the agency's action and the effect, and we have a direct connection here. When they set fuel economy, greenhouse gas emissions change. Thank you, Your Honors. Thank you, everyone, for their argument. The case just argued will be submitted for decision and the Court will stand in recess for the day. All rise.
judges: B. Fletcher, Siler, Hawkins